Thomas VAUGHAN

v.

METAL LATHERS LOCAL 46
PENSION FUND et al.

James BUDDINE

v.

METAL LATHERS LOCAL 46
PENSION FUND et al.

William FRASER

v.

METAL LATHERS LOCAL 46
PENSION FUND et al.

Nos. 78 Civ. 2170 (LBS), 78 Civ. 2205
(LBS), 78 Civ. 2205 (LBS).

United States District Court,
S. D. New York.

June 14, 1979.

Schoffman & Skovronsky, Brooklyn, N. Y., for plaintiffs; Harold Skovronsky, Brooklyn, N. Y., of counsel.

Richard H. Markowitz, New York City, for defendants.

## OPINION

SAND, District Judge.

Plaintiffs,[1] three disabled metal lathers, challenge a recent amendment to the Metal Lathers Local 46 Pension Fund ("Plan")[2] which requires that an applicant for a disability pension earn two pension credits immediately prior to the onset of the disability. Jurisdiction is predicated on § 502(f) of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(f), and § 302(e) of the Labor Management Relations Act, 29 U.S.C. § 186(e). Both parties move for summary judgment. For the reasons hereinafter stated, Buddine's and Vaughan's motion for summary judgment is granted. Defendants' motion for summary judgment against Fraser is granted.

## FACTS

The factual pattern of these three actions is similar.[3] All three plaintiffs worked in the metal lather trade for a substantial number of years; their retirement pensions have vested. Due to an economic decline in the industry, they were laid off in 1975. Subsequent to the layoff, they became totally disabled.

The plaintiffs individually applied for disability pensions. The Trustees of the Pension Plan denied their applications for failure to comply with a 1977 amendment to the Plan: an applicant for a disability pension must have earned two pension credits immediately preceding the calendar quarter in which he became totally disabled.

The application of this amendment to the individual plaintiffs, however, raises different factual issues. For this reason, we detail the employment history of the three plaintiffs. *Buddine:* James Buddine has worked as a lather from October, 1960 until September, 1975 when he was laid off. In February, 1976 he again obtained employment as a lather and worked sporadically through October, 1976. While he was unemployed, he received unemployment compensation benefits.

In September, 1977 he applied for Social Security disability benefits. On November 25, 1977 Buddine received a Social Security Award Certificate which stated that he was disabled as of April, 1977.

On October 6, 1977, Buddine filed an application for a disability pension with the Plan. At the February 27, 1978 meeting, the Trustees determined that Buddine did not qualify for a disability pension because he did not earn two quarters of pension credit in the two calendar quarters immediately preceding his receipt of unemployment compensation benefits. Buddine did not appeal this decision.

*Fraser:* William Fraser was engaged in covered employment as a lather from 1957 until 1975.

In May, 1975 he was laid off and from that time until August, 1976 he received unemployment compensation benefits. In March, 1977 he suffered a heart attack. For the next twenty-six weeks, he received New York State disability benefits.

In April, 1975 Fraser applied for Social Security disability benefits and first re-

---

1. The three plaintiffs in this action (James Buddine, William Fraser, and Thomas Vaughan) filed separate complaints. Pursuant to stipulation, these three actions were consolidated.

2. Named as defendants in addition to the Plan itself, are John F. Pregenzer (Fund Director); James Maher, Edward O'Connell, Peter J. McGovern, John J. Ryan, James J. Downey, Jr., William Joshua Barnet, Jr., Alfred G. Gerosa, and Jeremiah Burns (Trustees); Metal Lathers'

Local Union 46; Thomas Reynolds (President of Union); Joseph Parker (Vice-President of Union); John Tierney (Treasurer of Union); and Frank Harrington, (Secretary of Union).

3. Aside from the question of notice, the essential facts are not in dispute and were admitted by plaintiffs pursuant to defendants' request for admission filed with the Court on January 19, 1979.

ceived benefits in September, 1977. The Social Security Administration dated his disability from April 1, 1977.

Fraser filed an application for a disability pension with the Plan on May 2, 1977. His application was denied by the Trustees on August 29, 1977. Although Fraser was advised of his right to appeal and initially indicated an intention to do so, he did not perfect his appeal.

*Vaughan:* Thomas Vaughan worked as a lather from 1945 until 1975. In August, 1975 he was laid off. He received unemployment compensation benefits from December, 1975 until September, 1976.

Vaughan applied for Social Security Benefits in October, 1976. In April, 1977 the Social Security Administration determined that he was permanently disabled and dated his disability from September, 1977.

Vaughan filed an application for a disability pension with the Plan in May, 1977. The Trustees determined that he was not eligible for a disability pension because he had not earned two pension credits in the two calendar quarters immediately preceding his receipt of unemployment compensation benefits. Vaughan appealed the decision. Although the Trustees adhered to their decision that he was not eligible for a disability pension, they told him that he was entitled to an early retirement pension which he is now receiving.

### Plan

The Plan, created in 1950, is a joint trust fund established pursuant to § 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186. The Plan is administered by a Board of Trustees whose members are designated by Local 46 and by the various employers who are parties to collective bargaining agreement with Local 46. The Martin E. Segal Company ("Segal") serves as the Fund's actuary and consultant.

The Plan is funded solely by employer contributions. The amount of the individual employer's contribution is determined solely by the earnings of his employees. In the last five years, there has been a significant decrease in the number of active employees and a corresponding decrease in the amount of employer contributions to the Plan. This change is reflected in the following table:

| Fiscal Year | No. of Plan Participants | Net Employer Contribution |
|---|---|---|
| 1974–75 | 2,875 | $ 2,253,400.00 |
| 1975–76 | 1,899 | 991,066.00 |
| 1976–77 | 1,154 | 859,638.00 |
| 1977–78 | 914 | 659,800.00 |

During the same period, the number of applications for retirement and disability pensions increased. The number of retirement and disability pensions awarded by the Plan is as follows:

| Fiscal Year | Disability Pensions | Retirement Pensions |
|---|---|---|
| 1974–75 | 24 | 63 |
| 1975–76 | 39 | 47 |
| 1976–77 | 44 | 58 |
| 1977–78 | 23 | 52 |

In 1976, the actuaries advised the Trustees that

"the level of Disability Pension awards was substantially greater than predicted by the actuarial assumptions and was in fact much greater than the number of such awards in prior years and that this was probably the result of the severe curtailment of employment opportunities and the liberal nature of the rules governing Disability Pension awards and finally that in view of the sharp drop in contribution income, the Trustees should be closely cognizant of ongoing developments in the Fund as a whole including the Disability Pension award experience."

Affidavit of James McIntyre, sworn to March 8, 1979, ¶ 6.

In an effort to protect the financial integrity of the Plan, the Trustees amended the Plan in June, 1976 to require disability pensioners to submit to a medical examination.[4] When the number of disability pensions continued to increase, the Trustees asked their actuary to draft additional re-

---

4. In October, 1977 this section was amended again to require that applicants submit proof that they have been granted a Social Security award for total disability.

strictive amendments. At a meeting on February 28, 1977, the Trustees amended Section 3.08 to require employment immediately prior to the onset of the disability. This "two credit" rule is as follows:

"Effective with respect to applications received on or after March 1, 1977, a Participant may only retire on a Disability Pension if he becomes totally disabled after he has earned at least 60 Pension Credits, of which two were earned immediately preceding the calendar quarter in which he became totally disabled. Notwithstanding the above, if a Participant was collecting Weekly Accident and Sickness Benefits (or was eligible for same but for the receipt of No-Fault Automobile Insurance Benefits) from the Metal Lathers Local 46 Trust Fund or collecting Workmen's Compensation Benefits or New York State Unemployment Insurance Benefits during the two calendar quarters immediately preceding the calendar quarter in which he became permanently and totally disabled, he shall be eligible for a Disability Pension only if he earned at least two Pension Credits immediately preceding the calendar quarter in which he became eligible to receive either the Accident and Sickness Benefits (or became eligible for same but for the receipt of No-Fault Automobile Insurance Benefits) or Workmen's Compensation or New York State Unemployment Insurance Benefits."

It is this amendment that plaintiffs challenge in the instant action.

### Standard of Review

Plaintiffs argue that the Trustees ignored the Plan's rules on the accrual of pension credits when they considered their applications for a disability pension. Under plaintiffs' interpretation of the "two credit" rule, they qualified for a disability pension because they had accumulated the requisite pension credits prior to their disability. Alternatively, they argue that the denial of their pension benefits was arbitrary and

capricious because the subject amendment is inherently arbitrary and invalid, or, if valid, unreasonably applied to them.

■ Before examining the merits of plaintiffs' claim, we note that under the terms of the Plan, the Trustees had the authority to promulgate and establish rules and regulations for the administration and operation of the Plan.[5] Thus, this Court's review of the Trustees' action is necessarily limited to whether the eligibility requirements, or the application of these requirements to the particular facts, are arbitrary and capricious. *See, e. g., Riley v. MEBA Pension Trust,* 570 F.2d 406, 412–13 (2d Cir. 1977); *Rehmar v. Smith,* 555 F.2d 1362, 1371–72 (9th Cir. 1977); *Johnson v. Botica,* 537 F.2d 930, 935 (7th Cir. 1976); *Beam v. International Organization of Masters, Mates & Pilots,* 511 F.2d 975, 979–80 (2d Cir. 1970).

■ Under this standard, we need not determine whether the Trustees drafted the best possible eligibility requirements. It is sufficient that the Trustees' requirements have a rational justification. *See Riley v. MEBA Pension Trust, supra*; see also *Roark v. Boyle,* 141 U.S.App.D.C. 390, 392, 439 F.2d 497, 499 (1970) (In applying the arbitrary and capricious standard of review, courts should be careful "to avoid second guessing the discretionary judgments of the Trustees . . . .").

### Adoption of the Amendment

Defendants maintain that in amending the eligibility requirements for disability pensions, the Trustees acted properly and reasonably in an attempt to preserve the financial integrity of the Plan and to provide an actuarially sound formula for the payment of pension benefits. Specifically, defendants contend that they were justified in restricting disability pensions for the following reasons: the decrease in the financial assets of the Plan; the decrease in the number of covered employees and in the

---

**5.** Section 8.01 of the Rules and Regulations of the Pension Plan provides that the "Plan may be amended at any time by the Trustees, consistent with the provisions of the Trust Agreement."

amount of employer contributions; the increasing number of disability pensions and the substantial increase in pension payments as compared to the net income of the Plan.

Plaintiffs do not dispute that the Trustees of the Plan had an obligation to amend the Plan regulations to counteract the decline in the level of employer contributions. Rather, they maintain that the Trustees should have chosen a method other than the "two credit" rule to distribute the diminishing assets of the Plan to an increasing number of disability pensioners. According to plaintiffs, the rule adopted is intrinsically arbitrary.

■ Having examined the affidavits of James McIntyre, Vice-President of Segal, and G. Thomas O'Reilly, the Plan Director, and the facts admitted by the parties, we conclude that the Trustees did not act arbitrarily or capriciously in amending the Plan to require an applicant for a disability pension to have earned two pension credits prior to the onset of the disability. We find that the "two credit" rule was dictated by economic conditions beyond the control of the Trustees. We recognize that the Trustees' actions in such circumstances can often appear arbitrary to the class on whom the burden disproportionately falls. It is not the Court's function, however, to rewrite individual pension plans to ensure that all participants are given maximum benefits.

Thus, this Court will not consider alternative amendments that the Trustees could have adopted.[6] As the Tenth Circuit stated in *Mestas v. Huge*, 585 F.2d 450, 453 (10th Cir. 1978), "[w]here the trustees of a pension fund in setting eligibility standards have several rational alternatives, and select one and reject the others, there is no basis for judicial intervention."

Moreover, the evidence before us indicates that the Trustees acted cautiously in amending the disability requirements. Before adopting the "two credit" rule, they attempted to ensure that all applicants were truly disabled by requiring medical examinations. When the medical examination requirement did not reduce the number of disability pensions, the Trustees directed their actuary to propose further changes. On the recommendation of their actuary and legal counsel, the Trustees adopted the "two credit" rule.

The "two credit" rule limits disability pensions to those who are actually working in the industry at the time that they become disabled. The Trustees are entitled to limit the disability benefit to those employees who have maintained an attachment to the industry. Such loyalty requirements have been upheld in other contexts. See *Cawley v. NMU Pension and Welfare Plan*, 457 F.Supp. 301 (S.D.N.Y.1978); *Mosley v. NMU Pension and Welfare Plan*, 451 F.Supp. 226 (E.D.N.Y.1978).

### Application of the "Two Credit" Rule

The determination of the validity of the amendment does not end our inquiry. Plaintiffs maintain that even if the amendment is valid, they were improperly denied a pension because the Trustees incorrectly interpreted the rules of the Plan. We agree with plaintiffs that the Trustees miscalculated the accrual of pension credits.

The "two credit" rule requires that an applicant for a disability pension earn "at least 60 Pension Credits, of which two were earned immediately preceding the calendar quarter in which he became totally disabled." The method for the accrual of pension credits is set forth in section 4.01 of the Plan. This section provides that, with regard to employment commencing on or after January 1, 1973, a participant is entitled to one pension credit for each $1,200 of earnings with a maximum of four pension credits per year for earnings in excess of $4,800.

Defendants concede that section 4.01 awards pension credits on the basis of annu-

---

**6.** For example, plaintiffs maintain that the Trustees could have adopted more reasonable restrictions, *i. e.*, reduction of benefit levels for all disability pensioners, setting a minimum age, or increasing the minimum number of years of service.

al earnings. In other words, if a covered employee earned $4,800 during the period January to March of any year and earned nothing during the balance of the year, four pension credits would be earned. Defendants nevertheless argue that, for purposes of the disability amendment, $1,200 must be earned in each three-month period for which a credit is claimed:

"In effect, the Trustees have considered, for purposes of Section 3.08 and the question of eligibility for a Disability Pension, that the earning of $1,200 or one Pension Credit is related to a quarter. This interpretation logically follows from the application of Section 4.01. It is in this light that the reference to the earning of two Pension Credits 'immediately preceding the calendar quarter in which he became totally disabled' must be construed. In other words, Section 3.08 of the Plan Regulations requires an employee to earn two Pension Credits, or $1,200 per quarter, in the two calendar quarters prior to the onset of disability." Letter of Richard H. Markowitz to Court dated May 25, 1979.

In support of this unique interpretation of section 4.01 for disability pensions, defendants quote the minutes of the Trustees' meeting which adopted the "two credit" rule and the March, 1977 newsletter of the Fund which outlined the new disability requirements. Both documents refer to two quarters of pension credits: "a Participant may only retire on a Disability Pension if he becomes permanently and totally disabled after he has earned at least 15 years of Pension Credit of which two quarters were earned immediately preceding the quarter in which he became permanently and totally disabled." [7]

■ According to defendants, the Trustees intended that the two quarter requirement should be read into sections 3.08 and 4.01 and that this Court should find this

intent controlling. Yet, defendants admit, as indeed they must, that the language of the Plan regulations control. The regulations compute pension credits on an annual basis. Defendants chose in their amendment to the disability provision to incorporate by reference the system for computing pension credits. There is no dispute that this is an annualized computation. Since the Trustees utilized pension credits for purposes of determining eligibility for disability benefits, these credits must continue to be computed on a yearly basis for disability purposes absent any language *in the Plan* changing the basis of the computation. Because pension credits are computed at the end of the calendar year, the year for consideration for a disability application must be the calendar year immediately preceding the calendar quarter in which the applicant became totally disabled. [8]

■ Under this interpretation of the amendment, plaintiffs Buddine and Vaughan are entitled to a disability pension. The Social Security Administration determined that Buddine was disabled as of April, 1977. Because he received unemployment compensation benefits from October, 1976 through September, 1977, the relevant period for purposes of the "two credit" rule is the 1975 calendar year. In that year, Buddine earned $10,514.80 and thus earned four pension credits.

■ Similarly, Vaughan was disabled in October, 1976. He received unemployment compensation benefits from December, 1975 through September, 1976. In 1974, he earned $4,175.65 and thus earned three pension credits.

Fraser's claim, however, cannot be disposed of summarily. In his application for a disability pension, he stated that he was disabled on March 25, 1977. The Social Security Administration determined that he was disabled as of April, 1977. Fraser ad-

---

7. Defendant's Request for Admission, ¶ B(15).

8. We recognize that this interpretation is somewhat strained; nevertheless, we are compelled by the language of the Plan to adopt a calendar year. Even if we were to use the four quarters

immediately preceding the receipt of unemployment compensation benefits, Buddine and Vaughan would qualify for a pension. Buddine earned $3,361.40 and Vaughan earned $4,292.04 in this period.

mits that if he was first disabled in the spring of 1977, he does not qualify for a disability pension under the rules as they now exist. He argues, however, that the disability date in his pension application and in the award certificate of the Social Security Administration is incorrect; the correct date is October, 1976.

For purposes of the Plan's disability pension, the critical date is the date that the Social Security Administration determines that he is totally disabled. If plaintiff believes that the Social Security Administration miscalculated this date, his remedy is with the Social Security Administration, and not the Trustees of the Plan.

Alternatively, Fraser argues that the "two credit" rule should not be applied to him because he did not receive notice of the amendment and it was impossible for him to earn the requisite credits because of unavailability of work in the industry.

Defendants contend that the notice argument is without merit. In March, 1977, the Fund office published a newsletter which described the new requirements for a disability pension. Although Beverly Lasoff, the Fund employee responsible for the distribution of the newsletter, avers that this issue of the newsletter was mailed to all participants and beneficiaries, Fraser contends that he did not receive a copy of the newsletter until after he attempted to obtain an application for a disability pension.[9]

We need not now determine whether Fraser actually received a timely copy of the newsletter. We agree with defendants that the publication of the new rule in the newsletter was a reasonable method of notifying participants and beneficiaries of the Plan of the February 28, 1977 amendment. Moreover, it is unclear whether notice is actually at issue here. Plaintiff admits that he suffered a heart attack on March 25, 1977 and was unable to work afterwards. Thus, even if he had received the March newsletter a few days after the adoption of the amendment, there is no indication in the record that he could have satisfied the "two credit" rule.

Similarly, we conclude that Fraser's claim that it is unfair to permit circumstances beyond the employee's control, such as unavailability of work, to determine pension eligibility must fail. As the court observed in *Sprague v. Pension Fund of the International Union of Operating Engineers*, No. 78–292 (D.Conn. November 14, 1978), "LRMA has never been authoritatively construed to require that pension benefits vest so long as an employee demonstrate a willingness to work." Moreover, Fraser does not claim that work was unavailable for the entire period between 1975 (when he was laid off) and 1977 (when he was disabled). According to his affidavit, he sought "any employment that would not be too physically taxing" after his unemployment benefits terminated in August, 1976. He worked as a night watchman from September, 1976 until March, 1977. While we recognize that this decision was made for reasons of health and had work been more readily available in the lathing industry plaintiff might have chosen to expend his limited energy to obtain such work, the fact is that plaintiff did not work in the industry for two years prior to his disability.

Finally, Fraser claims that it is unfair to deny him a disability pension now because he could have retired with such a pension in 1975. The record before us does not support the assertion that Fraser was totally disabled in 1975.[10] Moreover, even

---

9. Fraser states that he called John Pregenzer, the Fund Director, for a disability pension application form on April 14, 1977. A day or two later, he states that he received for the first time a copy of the newsletter containing the text of the amendment.

10. From May, 1975 through August, 1976 Fraser admits that he received New York State unemployment insurance benefits. If he was disabled at this time, he would not have been eligible for unemployment insurance benefits. New York Unemployment Insurance Law provides that "[n]o benefits shall be payable to any claimant who is not capable of work or who is not ready, willing and able to work in his usual employment or in any other for which he is reasonably fitted by training and experience."

assuming that Fraser could make the requisite showing, disability pension rights do not vest under ERISA.

### CONCLUSION

Accordingly, summary judgment for plaintiffs Buddine and Vaughan is granted. Plaintiff Fraser's motion for summary judgment is denied. Defendants' motion for summary judgment against Fraser is granted.

Settle order on five days' notice.

Victor H. Ashe, II, Morton, Lewis & Krieg, Knoxville, Tenn., for plaintiff.

John H. Cary, U. S. Atty., Knoxville, Tenn., for defendant.

New York Labor Law § 591(2) (McKinney 1977).